**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BRION A. SCUDDER, | : | |
| | : | |
| *Plaintiff*, | : | Civil Action No.: 2:20-cv-807 |
| | : | |
| v. | : | |
| | : | |
| INDIANA UNIVERSITY OF | : | |
| PENNSYLVANIA, MICHAEL A. | : | |
| DRISCOLL, TIMOTHY S. MOERLAND, | : | |
| ROBERT CAMP, PRASHANTH | : | |
| BHARADWAJ, RAJENDAR GARG, | : | |
| AND IBRAHIM AFFANEH | : | |
| | : | |
| *Defendants*. | : | |

## <u>COMPLAINT</u>

AND NOW, comes the Plaintiff, Brion Scudder, by and through his undersigned

counsel, Sean A. Casey, Esquire, and files the following Complaint:

### Jurisdiction and Venue

1. This action arises in part under 42 U.S.C. § 2000e *et seq*., as amended by the

Civil Rights Act of 1991, and 42 U.S.C.A. §1981(a).

2. Jurisdiction over Plaintiff's claims is conferred on the Court by 28 U.S.C.

§§1331, 1343, and 1367.

3. This action also arises under the Civil Rights Act 42 U.S.C. section 1983 for

the violation of Plaintiff's constitutional rights by Defendants, acting under color of state

law.

1

4.     The Court may also maintain supplemental jurisdiction over state law claims set forth herein (or later added) pursuant to 28 U.S.C. section 1367(a) and Rule 18(a) of the Federal Rules of Civil Procedure because they are sufficiently related to one or more claims within the Court's original jurisdiction in that they form part of the same case or controversy.

5.     Venue in this District is proper under 28 U.S.C. §1391(b),(c).

**Parties**

6.     Plaintiff, Brion A. Scudder, is a Pennsylvanian resident residing at 285 Olive Street, Indiana, PA 15701. Plaintiff, Brion A. Scudder is and has been an employee of Defendant Indiana University of Pennsylvania throughout the duration of this complaint.

7.     Defendant Indiana University of Pennsylvania ("IUP") is a Pennsylvania State System of Higher Education ("PASSHE") university located in Indiana County, Pennsylvania, and employs in excess of five hundred (500) employees.

8.     Defendant Michael A. Driscoll is the President of IUP and he is being sued in his official capacity including, but not limited to, for prospective monetary damages and injunctive relief. Upon information and belief, the Court has jurisdiction over the defendant because defendant works and resides in the Western District of Pennsylvania.

9.     Defendant Timothy S. Moerland is the Provost of IUP and he is being sued in his official and personal capacity, including but not limited to monetary damages and injunctive relief. Upon information and belief, the Court has jurisdiction over the defendant because defendant works and resides in the Western District of Pennsylvania.

10.     Defendant Robert Camp is the Dean of the Eberly College of Business and Information Technology, a division of IUP, and he is being sued in his official and personal

capacity, including but not limited to monetary damages and injunctive relief. Upon information and belief, the Court has jurisdiction over the defendant because defendant works and resides in the Western District of Pennsylvania.

11.    Defendant Prashanth Bharadwaj is the director of the IUP-India Bangalore PES Program, (hereinafter "India Program"), a division of IUP or a program falling under the direction of IUP, and he is being sued in his official and personal capacity, including but not limited to monetary damages and injunctive relief. Upon information and belief, the Court has jurisdiction over the defendant because defendant works and resides in the Western District of Pennsylvania.

12.    Defendant Rajendar Garg is the director of the IUP SWUFE China Program (hereinafter "China Program"), a division of IUP or a program falling under the direction of IUP, and he is being sued in his official and personal capacity, including but not limited to monetary damages and injunctive relief. Upon information and belief, the Court has jurisdiction over the defendant because defendant works and resides in the Western District of Pennsylvania.

13.    Defendant Ibrahim Affaneh is the Chair of the Finance and Legal Studies Department and Director of the IUP AAUJ program (hereinafter "Palestine Program"), a division of IUP or a program falling under the direction of IUP, and he is being sued in his official and personal capacity, including but not limited to monetary damages and injunctive relief. Upon information and belief, the Court has jurisdiction over the defendant because defendant works and resides in the Western District of Pennsylvania.

**Exhaustion of Remedies**

14.    The allegations contained in the forgoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

3

15.    On or about September 15, 2019, Plaintiff timely filed charges of discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC") and the Pennsylvania Human Rights Commission alleging discrimination based on race, color, national origin and retaliation and creation of a hostile work environment with the Equal Employment Opportunity Commission, located in Pittsburgh, Pennsylvania, alleging discrimination and retaliation by Defendant under Title VII, as amended.

16.    A right to sue letter was issued by the EEOC on March 4, 2020 and received by Plaintiff on March 5, 2020, and the Complaint was filed within the ninety (90) days of Plaintiff's receipt taking into account weekends, holidays and federal government shutdown periods.

17.    Plaintiff has fulfilled all conditions precedent to the filing of this action, which is timely filed.

## Factual Background

18.    The allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

19.    As background for this matter, IUP hired Plaintiff as an associate professor of law in its Finance and Legal Studies Department in August of 2010.

20.    Plaintiff is a white, American born, Caucasian male.

21.    Plaintiff has experienced ongoing and persistent racial, national origin and color-based discrimination, harassment and retaliation at IUP since 2010.

22.    The Eberly College of Business and Information Technology (ECOBIT) consists of fifty-two (52) faculty members in five (5) departments.

4

23.     Upon information and belief more than 25% of the full-time tenure track faculty in the Eberly College of Business have India as an origin, 20% have Mideastern origin, 10% have Asian pacific origin and 40% are white Caucasian.

24.     Upon information and belief, the percentages of white Caucasians in the United States generally is 76.9% and in PA 82.4%.

25.     Upon information and belief, the percent of Indian origin in the United States is (1%) and Mid-East origin are less than 1%.

26.     Dr. Bharadwaj states in an email that thirteen (13) faculty have India as an origin (25% of faculty), and thirteen (13) have other countries of origin outside the United States.

27.     During the time frame of the Complaint all leadership positions in Eberly including (every chair of every department) the Chair of Accounting, Chair of Marketing, Chair of Finance and Legal Studies, Chair of Information Systems, Chair of Management, Director of the EMBA program, Director of the MBA program, Director of India Program, Director of the Palestine Program, and Director of the China program were all of Indian or Mideastern origin.

28.     On numerous occasions during weekly chairs meetings and generally in conversations the chairs of the departments and directors of these international programs and MBA programs referred to themselves as the "India Mafia" and demonstrated their racial bias and discrimination by preferentially awarding access to employment and teaching contracts and opportunities to members of their own race and denying Plaintiff, as a white Caucasian, access to these opportunities.

29.     Plaintiff on numerous occasions has received derogatory and threatening

messages from IUP faculty who manage international teaching opportunities or are in attempt to retaliate against the Plaintiff for exercising his rights under federal law.

30.    Defendant Dr. Garg acting individually or within the scope of his job publicly wrote to the entire faculty within the Eberly School of Management, "Guess what Brion, I shall not report or run to your mom or dad and complain. I will deal with you in my own way at the time and place of my choosing."

31.    Such language was a threat to Plaintiff for exercising his rights under Title VII and is derogatory, demeaning and retaliatory.

32.    Further, Dr. Garg, acting individually or within the scope of his job, publicly wrote to the entire faculty within the Eberly School of Management, in referencing the Plaintiff, "The guy behaves like a little crying baby who throws tantrums, and runs to his mom and dad because he couldn't get his toy."

33.    Such language is a reference to Plaintiff exercising his rights under Title VII and is derogatory, demeaning and retaliatory.

34.    Further on or about November of 2018 Dr. Raj Garg, acting individually or within the scope of his job, filed a false and fraudulent complaint against Plaintiff with the IUP Office of Social Equity in retaliation for Plaintiff's exercise of rights under Title VII.

35.    In such complaint he alleges Plaintiff used the term "India Mafia" to refer to him.

36.    Plaintiff had never used such term and had not heard of such term until Dr. Raj Garg had used it in his complaint.

37.    Upon information and belief, the term, ("India Mafia") was used by Dr. Raj Garg and others of his race at IUP to refer to themselves as the controlling group ("in-

6

group") in Eberly that controls access to assigning teaching contracts for additional compensation.

38. Dr. Raj Garg, either acting under the direction of IUP or individually, also filed a complaint against Plaintiff and asserted that Plaintiff's emails informing the faculty of working conditions under the National Labor Relations Act was a violation of Dr. Garg's rights.

39. Dr. Raj Garg and IUP either knew or should have known that such statements are protected under federal law.

40. Dr. Raj Garg subjected Plaintiff to a needless investigation in an attempt to have negative employment consequences and in attempt to defame Plaintiff in retaliation for filing an EEOC charge and is also evidence of racial discrimination as Plaintiff is not a part of the "India Mafia" controlling "in-group" he referenced.

41. When investigating Dr. Raj Garg's complaint, the IUP Office of Social Equity and Dr. Raj Garg, used Plaintiff's complaining about Title VII violations as basis for possible negative employment actions by claiming that such complaints were offensive to Plaintiff's co-workers.

42. The Director of the "India Program", Dr. Bharadwaj himself admits in an email that, "33% of all faculty involved in international teaching are Indian and 40% of all classes taught internationally have been taught by Indians".

43. In essence the director of the "India Program", has admitted that a homogenous racial group that represents 25% of the faculty are teaching 40% of the classes and, upon information and belief, benefiting from 64% of all international teaching contracts.

44.     Furthermore, when other non-Caucasians teaching in the international programs are considered, upon information and belief, greater than 80% of all faculty involved in international teaching are non-Caucasian and 80% of all international contracts are given to non-Caucasians.

45.     Moreover, and significantly, for this case, the entire legal faculty are all Caucasian during the entire term covered under the Complaint and represent the only faculty unit (or subject matter unit) within ECOBIT that are all of one race.

46.     The director of the India Program who selects the faculty who teach in the program, Dr. Bharadwaj has stated in an email that Plaintiff and the other law faculty will never teach in the India program.

47.     Such statement by Dr. Bharadwaj acting with individually or within the scope of his employment was in retaliation for Plaintiff filing or raising claims of discrimination.

48.     This decision was racially biased and is a continuing and ongoing racial discrimination.

49.     In a meeting with the IUP Social Equity Office on February 20, 2018, it was suggested to Plaintiff by Dr. Glenn that the racial discrimination problem was because we (the law faculty) didn't hire an Indian or minority law faculty member.

50.     While employees are employed by Indiana University of Pennsylvania nearly all of their professional life is governed by their colleges (ECOBIT) and departments (Finance and Legal).

51.     The department and college are in charge of selection and interviewing, hiring, performance reviews, assigning faculty teaching schedules, assigning faculty to extra

pay summer contracts, assigning faculty to extra pay winter contracts, assigning faculty to extra pay international teaching contracts, and assigning faculty to teach in extra pay graduate programs such as EMBA and the ECOBIT PHD program, and assigning faculty to extra pay administrative roles. The employment level unit to examine when looking at violations of state and federal law is ECOBIT.

52. IUP-ECOBIT has been sending and paying IUP faculty to teach in India since 2005, Palestine- Ramallah since 2012 and in China.

53. Significantly, law is the only course that is mandated in IUP's MBA program that has not been taught by IUP faculty in India for fourteen (14) years and only once in AAUJ in six (6) years.

54. By contract IUP faculty must teach ten (10) of the eleven (11) courses offered in the India Program.

55. There is nothing in the India Program and IUP contract supplied by the Defendants to the EEOC that mentions Business Law or grants the host university in India (PES) the exclusive right to teach business law.

56. The India PES Bangalore program, "India Program" awards an IUP MBA degree and MUST follow the IUP required MBA courses including Business Law 633.

57. Since 2005 the PES-Bangalore program is administered by Dr. Prashanth N. Bharadwaj, Dean's Associate, IUP-India Program Director

58. Since 2005, Dr. Bharadwaj assigns faculty to teach in the program and has been in charge of its administration.

59. IUP determines what courses are taught by IUP and what courses are taught by the host university.

60.     The India Program and IUP contract indicates that most or all of the courses are to be taught by IUP faculty and does not specify what courses are to be instructed by each institution

61.     For fourteen (14) years IUP has been paying between $22,500-$55,000 per participating faculty member, per year to teach internationally in India and Palestine.

62.     Since 2005, IUP has paid millions of dollars to IUP faculty to teach the courses under the IUP MBA program.

63.     The all Caucasian IUP law faculty, including Plaintiff, were paid zero dollars for teaching in India and IUP law faculty were never allowed to teach the Business Law 633 required course in India.

64.     The University Senate of IUP has never approved any changes in curriculum offerings for its international MBA programs and IUP must teach the same courses and the same material in all of its international locations as it does domestically.

65.     Over the last fourteen (14) years, despite documented repeated requests to teach in India by all members of the IUP law faculty, no IUP law faculty has been allowed to teach the IUP business law course in India.

66.     This exclusion policy for the law course has happened in India for every law course at least twenty-eight (28) times, and in Palestine nine (9) times out of ten (10).

67.     Each time a course is offered two professors from IUP teaching that course are paid to teach the course in India

68.     Total IUP teaching contracts where IUP faculty are paid to teach in India per year are estimated to be twenty-four (24) contracts per year over fourteen (14) years that

amounts to three hundred and thirty-six (336) contracts. Of the three hundred and thirty-six (336) contracts none of them have gone to the all Caucasian law faculty.

69. Of the thirty-seven (37) times law has been offered internationally, thirty-six (36) times IUP law faculty, including the Plaintiff, have been denied an opportunity to teach in these programs despite a documented desire to do so.

70. Thirty-seven (37) times the law faculty including the Plaintiff, have applied for such teaching opportunities and have been denied or eliminated from consideration.

71. Evidence shall establish a pattern of eliminating courses that could be taught by IUP faculty if such faculty were predominantly Caucasian and awarding the contracts to areas and courses dominated by Indian and non-Caucasian faculty.

72. The IUP Faculty Senate approved program in PES-Bangalore indicates it follows the same courses and program requirements and syllabi as IUP's domestic EMBA and MBA programs. As such business law (BLAW 633) is a required course for each graduating class.

73. Estimated number of times each course has been taught in India by IUP faculty from 2005-2018

Total

QBUS 601:   6     # times a non-Caucasian from IUP has taught course     3

MGMT613:   52     # times a non-Caucasian from IUP has taught course     49

ACCT 607:   55     # times a non-Caucasian from IUP has taught course     50

ECON 634:   08     # times a non-Caucasian from IUP has taught course     3

BTST 670:   02     # times a non-Caucasian from IUP has taught course     0

IFMG 640:   48     # times a non-Caucasian from IUP has taught course     40

11

MKTG 603: 56      # times a non-Caucasian from IUP has taught course      56

FIN 630:     55      # times a non-Caucasian from IUP has taught course      49

BLAW 633: 0      # times a non-Caucasian from IUP has taught course      0

MGMT 695: 52      # times a non-Caucasian from IUP has taught course      48

74.    Evidence will establish that IUP Eberly is giving only the courses taught predominantly by Non- Indian-Non-Mid-Eastern and mostly Caucasian faculty to the local host university while at the same time maximizing courses where the IUP faculty are dominated by Indian and Mid-Eastern Faculty.

75.    Upon information and belief, law faculty are 100% Caucasian, Economics faculty are over 80% Caucasian, QBUS faculty are over 80% Caucasian, BTST faculty are over 80% Caucasian.

76.    Upon information and belief, well over 85% of all international teaching contracts are awarded to non-Caucasians (62% to Indian, 24% to Mid-Eastern) despite the fact that Caucasians make up 47% of the faculty within Eberly College of Business and Information Technology.

77.    In addition, IUP ECOBIT has been intentionally eliminating courses taught predominately by Caucasians and allowing those contracts to be taught by the local populations thus giving those contracts to Indians and Mid-eastern local populations and discriminating on the basis of race and national origin.

78.    IUP- ECOBIT has engaged in a pattern or practice that maximizes benefits to the non-Caucasian faculty.

79.    All three members of the IUP law faculty have demonstrated multiple times their willingness and desire to teach in the international programs both verbally and in writing.

80.    Plaintiff has in many meetings and through many emails asked to be a part of all international programs including without limitation India, Palestine and the China program.

81.    Plaintiff made numerous requests verbally and in writing in 2013, 2014, 2015, 2016, 2017 and 2018.

82.    In 2018 Plaintiff made a continuing and ongoing request to teach in the International EMBA programs.

83.    Each request Plaintiff made was either denied or ignored.

84.    The other two law faculty members in the Eberly College of Business are Dr. Martha Troxell and Dr. Henry Webb and they have asked numerous times to participate in the international teaching programs and have been denied or ignored.

85.    In fact, when Dr. Henry Webb was hired in 2015, he was hired with the understanding that he would be teaching business law internationally and in fact his extensive experience teaching business law in many countries for over ten years was a significant reason he was selected.

86.    A part of his interview process was speaking with various international program directors with the expectation that he would be teaching in these locations.

87.    This was openly discussed among the faculty selection committee at the time of his hiring. Since being hired Dr. Webb has voiced his desire to teach in the India and other programs.

13

88.     Plaintiff has the requisite qualifications to teach the BLAW 633 course that is a part of the international programs.

89.     Plaintiff, holds a Juris Doctor Degree, A Masters of Business Administration degree, and a Bachelor of Science in Business Administration from the State University of New York at Buffalo.

90.     Plaintiff is a registered licensed attorney in New York State.

91.     Plaintiff has taught this exact course (BLAW 633) multiple times per year, every year, since he started with IUP in 2010 as part of the EMBA and MBA domestic program and is highly qualified to teach the course.

92.     Plaintiff has taught this course internationally only once in Palestine as part of the IUP AAUJ program ("Palestine Program").

93.     The requirements to teach the course BLAW 633 is a Juris Doctor Degree and Dean Camp even specified this in the advertising for the position.

94.     The search criteria for a position to teach business law, including Business Law 633 both domestically and internationally, was approved by Dean Camp and required a Juris Doctor degree from an ABA accredited law school. Dean Camp himself agreed that such person must have a Juris Doctor from an ABA accredited law school.

95.     Despite the Plaintiff asking for such job opportunities (to teach internationally), being qualified for the position, the positions were filled with unqualified IUP Indian faculty with marketing degrees or other unqualified faculty based on their race, color and ethnicity.

14

96.     Upon information and belief, none of the Professors teaching the Business Law 633 course in India or Palestine have the required qualifications as promulgated by IUP to teach the course.

97.     Upon information and belief, none of the IUP professors who have taught Business Law 235 in China have the required qualifications as promulgated by IUP to teach the course.

98.     Upon information and belief, none of the professors teaching business law in China have the required qualifications as promulgated by IUP to teach the course

99.     Upon information and belief, IUP knew or should have known this and intentionally assigned those roles to the unqualified personnel to maximize employment opportunities for members of their own race over that of Caucasians.

100.    Members of the IUP marketing faculty, each of Indian national origin, Dr. Krish Krishnan and Dr. Raj Garg taught a law course, Business Law 235, for IUP and as representing IUP in China that they were unqualified to teach.

101.    Upon information and belief, Dr. Krish Krishnan and Dr. Garg received compensation in the form of salary, travel, lodging from IUP in support of this teaching assignment

102.    Upon information and belief, Dr. Krish Krishnan and Dr. Garg used IUP university resources to facilitate this teaching.

103.    Dr. Raj Garg has never taken a bar exam, is not an attorney, does not hold a Juris Doctor Degree and is unqualified to teach business law by the standards set within IUP and ECOBIT.

15

104.    Dr. Krish Krishnan has never attended law school, does not hold a Juris Doctor Degree, has never taken or graduated from any domestic or international law program, and has never passed a state bar exam. He is not qualified to teach business law at the undergraduate or graduate level by ECOBIT's own standards for hiring and by the standards ECOBIT must comply with for IUP's accreditation (AACSB).

105.    Plaintiff shall also show that Dr. Krish Krishnan was at the SWUFE University in China during the time the course was offered, was in the classroom during the business law class in question and that the syllabi listing Dr. Krish Krishnan as the instructor of the course, and listing his IUP email address as the contact information was in fact the syllabi on the active SWUFE course web page indicating that it was the official syllabi for the course in question. Plaintiff personally viewed the syllabi on the SWUFE website and so did Dr. Martha Troxell.

106.    IUP knew these unqualified faculty were teaching a law course under the name of IUP because Plaintiff informed them and in fact, they then accepted such courses into IUP as transfer credit as a business law course even though they knew unqualified personnel were teaching the course.

107.    Further, when Plaintiff  and Dr. Troxell attempted to secure a syllabus from  a student who took the courses taught in China by unqualified IUP personnel (Dr Krishnan and Dr. Garg), the Chief Academic Officer, Provost Timothy S. Moerland, initiated a university disciplinary complaint against Dr. Martha Troxell and Plaintiff for violation of The Family Educational Rights and Privacy Act, "FERPA".

108. Dr. Troxell's complaint was dropped, but Provost Timothy S. Moerland, acting individually or within the scope of his job, pursued Plaintiff's matter even though he was informed that FERPA does not protect a syllabus as a student record.

109. Provost Timothy S. Moerland was informed by the Plaintiff and was sent the web page that according to FERPA's own web site a syllabus is not even a document that is considered a student record and does not fall under the law.

110. Further, Provost Timothy Moerland was informed by an email from Sean Cottrell, Senior Subject Matter Expert, at privacy technical institute who answers FERPA questions for the government that, "I am writing in response to an inquiry received by the Student Privacy Helpdesk at the U.S. Department of Education. Your inquiry does not appear to be a FERPA issue. I cannot think of an instance where a class syllabus would be considered an education record for an individual student."

111. Despite all this information Provost Timothy Moerland, working within the scope of his job or individually, subjected Plaintiff to an investigation in retaliation for Plaintiff filing an employment action against the university. Even though the other professor (Dr. Martha Troxell), who asked for the same class syllabus, was not pursued.

112. Plaintiff would note that Mr. Craig Bickley, VP of Human Resources at IUP, informed Plaintiff and Dr. Chambers that the Provost, the chief academic officer, of the university was the complainant in this case.

113. Further Mr. Bickley acknowledged that the process for filing this charge did not follow the ordinary process in that the registrar's office wasn't involved.

114. IUP and ECOBIT currently have or are in talks with opening partnership programs across the world in different locations such as France, Columbia, Germany and to

17

the best of Plaintiff's knowledge law courses are not a part of the discussions in any of these other locations. Elimination of the law faculty for such other and future international locations discriminates against the law faculty based on their race and ethnicity.

115. Plaintiff would also note that all law faculty have been left out of the explore India program as referenced in the email by Dr. Bharadwaj. IUP pays for travel and lodging in association with this program and this program is considered a benefit and condition of employment which all law faculty have been denied.

116. While at AAUJ, Plaintiff had a conversation with Prof. Dr. Aysar Sussan, a Dean and Professor at AAUJ and at times teaches IUP courses at other locations for IUP. Dr. Sussan had asked Dr. Bharadwaj, Director of the PES-India Program, to teach in India, and according to Dr. Aysar Sussan, he was told by Dr. Bharadwaj that, "We like to reserve those spots for the Indians."

117. Around 2013 IUP entered into another partnership program with AAUJ ("Palestine Program") located in Ramallah. The program runs in the same manner and under the same pay provisions as India PES ("India Program"). Business Law 633 must be taught at AAUJ and requires the same syllabus and the same faculty qualifications to teach (Juris Doctor).

118. The original two-year contract entered into in 2013 excluded law faculty from teaching.

119. IUP & ECOBIT entered into this contract without consultation with the law faculty and only asked if law faculty were interested in teaching in the program after the contract eliminating law was already signed. As such, law was contractually excluded from 2013-2015 without even being able to apply for such teaching positions.

120. In fact in every single instance where contracts were signed that allegedly eliminated law from teaching opportunities in all of these various international locations (India, Palestine and China) , no one asked the law faculty if they were interested, no one consulted the law faculty at all for fourteen (14) years even though IUP and Eberly were on notice that there was interest from every member of the law faculty to have these opportunities.

121. Less than a month after the Plaintiff and Dr. Troxell had an opportunity to teach at AAUJ in Palestine, IUP created advertising that showed a picture of Plaintiff and Dr. Martha Troxell as featured faculty members who teach in all international programs.

122. Directly after the advertising was printed, Dr. Troxell and the Plaintiff were informed that they were never teaching again in the international programs.

123. The one time the Caucasian law faculty were given the opportunity to teach internationally the motive was to be used as a token white Caucasian in IUP advertising.

124. After IUP had Dr. Troxell's and Plaintiff's pictures in their advertising they went back to their norm of racial discrimination.

125. Various pretextual reasons have been proffered by IUP for why the all Caucasian law professors and the Plaintiff, in particular, have been denied the ability thirty-seven (37) times to teach in internationally and deprived of the ability to earn over $400,000 in lost wages.

126. These pretextual reasons are the "business reasons" proffered by the Defendants for their discriminatory actions.

127. The director of the India program, Dr. Prashanth Bharadwaj states "It is obvious that the area of law is less integral to an MBA program than economics, marketing,

finance, accounting, operations, MIS, human resources, international business and strategic management".

128.  Reasons that it is false and a pretext to justify racial discrimination. Law is an essential part of every business discipline and is mentioned in every textbook that is used at IUP to teach every business discipline. Accounting, Finance, Marketing, Human Resources and MIS have multiple chapters dedicated to the legal requirements and underpinnings of those   disciplines.

129.  The director of the India program Dr. Prashanth Bharadwaj states "MBA's don't make major decisions pertaining to law in businesses."

130.  Reasons that it is false and a pretext to justify racial discrimination, each and every decision a manager makes regardless of the individuals business discipline has legal implications. Every industry, every profession, and every decision has a legal component. Negligence, Strict Product Liability, Contracts, Employment law, Business Organizational law, criminal law are universally important across the globe. The Wall Street Journal is filled everyday with articles relating how failure to comply with the law has devastated companies, industries and organizations.

131.  The Director of the India program, Dr. Prashanth Bharadwaj, "Law should be taught by IUP law faculty ONLY if ALL 12 courses are taught by IUP faculty".

132.  The Director of India program, Dr. Prashanth Bharadwaj has basically stated that the law is not as important as all other possible forms of business education and business professionals don't need to know the law. He further categorically excludes all law faculty forever.

20

133.    Defendant's position statement to the EEOC states, "Once IUP determines which courses will be offered each semester, a rotation system is used to determine which faculty members will be offered the opportunity to teach the courses. A faculty member is selected to teach at AAUJ and PES on a rotation system based on if that faculty member is willing to teach 2. Qualified to teach and 3. listed highest on the rotation."

134.    Defendants admit that "IUP determines which courses will be offered" and they (IUP) have excluded the all Caucasian law faculty for fourteen (14) years and have awarded the majority of IUP teaching contracts to Indians and professors from the Mideast for the purpose of racial discrimination

135.    Evidence more than shows a continuous desire for every member of the IUP law faculty to teach in these programs, the Plaintiff is qualified to teach the course based on all the criteria mentioned and in fact the Plaintiff was teaching this SAME course domestically during the entire term of when the Complaint was initially filed.

136.    In thirteen (13) years the all Caucasian law faculty never even get listed on the rotation list at ALL. It is untenable to say IUP does not discriminate when the white Caucasians law faculty aren't even allowed to be on the list to begin with.

137.    Upon information and belief law is the ONLY course to be excluded from the rotation list in this manner and for this duration.

138.    Upon information and belief law has been singled out for special treatment because they are all Caucasian and the desire of the Defendants is to award these contract opportunities to Indian and Mideastern faculty that teach predominantly in marketing, accounting, management and finance.

139. The rotation system is neither facially neutral nor nondiscriminatory when it is being operated to manufacture a huge advantage for one race over that of another.

140. Dean Robert Camp, states "We don't have the financial resources to teach the law course".

141. Pre-textual because the law could be rotated into the program as one of the nine that they already teach by rotating another course out. This has been done countless times for other courses.

142. Such statement was retracted in an email where Dean Camp States," we can't afford to teach all twelve (12) classes". He also states "I have not said we could not teach law classes at off shore locations because we cannot afford them."

143. Dean Robert Camp says, "Our off shore locations do not have any qualified faculty in any of the other disciplines we teach in our MBA program".

144. Statement was said by Camp and memorialized in an email. An examination of the faculty at the off-shore locations shows that they have qualified faculty in every discipline except law.

145. In an email from Camp states: "I did not say that PES had no qualified faculty to teach their own MBA courses. What I said was that there best qualified faculty have historically been in information systems, quant methods, business law and economics. I stated that their faculty in functional business areas are not academically qualified according to our criteria."

146. This demonstrates racial motivation, because the areas he mentions above are predominantly taught by Caucasian faculty at IUP. By eliminating such courses (law,

economics) being taught by IUP faculty, Dean Camp can achieve the maximum benefits for the preferred Eberly IUP races of Indian and Mid-Eastern.

147.   Pretextual because the actual PES faculty website in fact shows that they have PHD level qualified faculty in every discipline except for law.

148.   Camp states, "We want to teach local law by using local professors."

149.   Pretextual because Prashanth Bharadwaj, the director of the India program, has admitted that the foreign locations in India and Palestine and the foreign professors teaching business law 633 are using IUP's domestic based syllabi for Business Law 633.

150.   Pre-textual because Camp's January 15, 2018 email states, I only meant that we should take into account the differences in legal systems and we need not do that with local professors.

151.   Pretextual because IUP is forbidden from teaching Business Law if it doesn't follow the IUP Senate approved syllabi and course description.

152.   Dr. Troxell and Plaintiff in fact followed his directive when they taught in AAUJ in 2016.

153.   Despite doing everything that Dr. Camp required, they have been categorically excluded for all international teaching.

154.   Dean Camp states, "The paramount goal is to assign the optimal combination of faculty based on not only their respective credentials, but also their history of instructional performance."

155.   Pre-textual because the law faculty at IUP which includes a former law professor who taught internationally for over ten (10) years, a JD/LLM with thirty (30) years teaching experience and multiple research awards, and a JD/MBA with stellar

teaching evaluations is far more qualified than any faculty member that teaches law at any of these international locations.

156. In fact, when asked by Plaintiff to substantiate the qualifications of the PES law faculty, Dean Camp writes, "I'm not inclined to invest my time or energy on such an exercise."

157. Dean Camp writes this because they he knows that the professors are not qualified to teach the course, the IUP law faculty are easily way more qualified and IUP and Eberly has a desire to give the law spots (contracts) to members of the Indian and Mid-eastern races, and further has a desire to eliminate the IUP law faculty from teaching in order to give their teaching contracts to marketing where they will be taught by the IUP and Eberly favored races.

158. Upon information and belief, none of the fifty-plus times this course has been offered has a qualified person taught the course who possessed an ABA Juris Doctor Degree as required by Dean Camp himself. Upon information and belief, the people who were hired to teach the Business Law 633 course were hired because they were of a favored race or ethnicity. Forty-two (42) times, the highly qualified IUP law faculty have been "skipped" over and ignored to make room for favored IUP faculty races, and IUP has instead placed an unqualified individual in the job for purposes of racial discrimination.

159. Dean Camp states, "we only recently had two professors interested in teaching".

160. This statement is incorrect and a pretext because Dr. Troxell, Dr. Webb and the Plaintiff have repeatedly voiced their desire to teach. Plaintiff even went so far as to volunteer to teach both sections of the law course if they couldn't find another professor

24

willing to go. In fact, IUP and ECOBIT in 2015 was willing to send just one person instead of two. Dr. Bharadwaj calls one faculty member spending a month in India teaching the whole thing "ideal".

161.    In addition to the acts of retaliation made by Dr. Raj Garg and Provost Moerland, further acts of retaliation were committed by Dr. Ibrahim Affaneh, Chair of the Finance and Legal Studies Department and the Administrator in charge of the AAUJ program ("Palestine Program"), as well as assigning faculty in the department to various money-making opportunities. He stated falsely in an email to Plaintiff and the rest of the faculty in Eberly that, "I would like to remind you that you have violated FERPA by giving your students exams to be proctored by the Department Secretary." Such statement accused Plaintiff of violating University policy as well as federal law and could have resulted in negative employment consequences and publicly hurt Plaintiff's reputation. This was stated in a public email and was not true. Dr. Ibrahim Affaneh, acted either individually or within the scope of his job duties, to defame Plaintiff as retaliation for filing against the Defendants for racial discrimination.

162.    Upon information and belief, Dr. Ibrahim Affaneh, the Chair of Plaintiff's department (Finance and Legal) and the director of the AAUJ program for international teaching opportunities in Palestine has made a false and fraudulent statement to the EEOC where he indicated that his ethnicity is "white", when he fact he was born in Palestine and is not Caucasian.

163.    A further act of retaliation was committed by IUP and Dean Robert Camp, either personally or within the scope of his employment, when he eliminated one of the three (3) law courses (Business Law 336) as a required course for accounting students. This

happened after or around the time Plaintiff made his initial complaint for racial discrimination and was done in retaliation for Plaintiff pursuing his federally protected rights.

164. A further act of retaliation was committed by IUP and Dean Robert Camp, either personally or within the scope of his employment, when he attempted to eliminate Business Law 633 from the graduate programs. Upon information and belief, a meeting was held where the graduate business law course instructed by all Caucasian faculty was to be eliminated because law and legal compliance is not important in the business world. This happened, after or around the time Plaintiff made his initial complaint for racial discrimination.

165. Further retaliation and discrimination occurred and is occurring regarding the requirement for Plaintiff to report all leave time while members of the faculty from India and the Mid-East do not have to report leave time when they miss classes.

166. Upon information and belief reported faculty leave time from 2010-2017 show a racial disparity in who has to report leave when they cancel classes and who does not.

167. The actions of IUP and ECOBIT, their extensive history violating federal discrimination laws, the numerous filings, lawsuits and plaintiffs demonstrate a reckless disregard for the law and require punitive damages.

168. News articles chronicle a history of ten (10) years of almost constant employment discrimination lawsuits and verdicts/settlements against IUP.

169. Most of these lawsuits originate from the Eberly College of Business, the Plaintiffs work environment.

26

170.    Eberly College of Business and Indiana University of Pennsylvania has a documented federal court history of violating court orders/settlements and failing to comply with federal court orders and or settlements resolving discrimination claims.

171.    IUP has failed to ameliorate any of the problems within its administration that has led to multiple discrimination cases including but not limited to failing to hire a compliance officer.

172.    Upon information and belief IUP has commissioned self-studies that found severe fault with the lack of legal compliance and noted the continuing and ongoing problem IUP and Eberly has in compliance with employment laws.

173.    Upon information and belief such studies were never made public or acted upon.

174.    On information and belief, on average members of the ECOBIT faculty or staff have filed complaints with the Office of Social Equity, the EEOC and the federal courts in far greater numbers than any other academic division at the university

175.    In addition, upon information and belief, more cases of discrimination have ended up in federal court and litigation than any other academic unit on campus.

176.    The alleged discriminatory conduct of ECOBIT and its managers has made front page news in the local press and has significantly and negatively reflected on the image of Indiana University of Pennsylvania.

177.    In short ECOBIT has a long history of discriminatory practices and university level management has not taken steps to properly ameliorate the discriminatory conduct. Many of the alleged complaints deal with alleged discriminatory practices by upper

management within ECOBIT and IUP that have been allowed to continue for over thirty (30) years.

178.    Subsequent to the Plaintiff filing his Complaint, the Defendant initiated disciplinary proceedings against the Plaintiff and ultimately suspend him from his teaching position on or about April 18, 2019.

179.    Further, President Driscoll issued another letter on May 10, 2019, calling for an interim evaluation of the Plaintiff, an evaluation 1 year prior to his five (5) year review, which would arguably violate the provisions of the Collective Bargaining Agreement for the Plaintiff's union.

180.    Plaintiff maintains that both actions were taken to harass, intimidate, retaliate against, and otherwise create a hostile work environment for the Plaintiff for asserting his rights under the Civil Rights Act.

181.    Plaintiff asks for compensatory damages, punitive damages, injunctive relief and court order monitored compliance.

**Count 1: Title VII of the Civil Rights Act-Race, Color and National Origin Discrimination**

182.    Plaintiff incorporates all the previous paragraphs by reference as if fully set forth herein.

183.    Plaintiff is an employee of Defendant within the meaning of Title VII of the Civil Rights Act, 42 U.S.C.A. § 2000e(f).

184.    Defendant is an employer of the Plaintiff within the meaning of Title VII of the Civil Rights Act, 42 U.S.C.A. § 2000e(b).

185.    Plaintiff was subjected unwelcome conduct by Defendant, by and through its employees, based on his race, color and national origin.

186.    The unwelcome racial discrimination against Plaintiff created an intimidating, oppressive, hostile, and offense work environment that interfered with Plaintiffs emotional and physical wellbeing.

187.    The conduct of Defendant was severe and pervasive and altered the conditions of Plaintiffs employment.

188.    Defendant failed to take all reasonable and necessary steps to eliminate racial discrimination and prevent it from occurring in the future.

189.    The harassment of Plaintiff by his supervisors and peers and Defendant's failure to reasonably prevent and eliminate such harassment constitutes discrimination on the basis of Plaintiffs race, color and national origin in violation of Title VII of the Civil Rights Act, 42 U.S.C.A. § 2000e *et seq*.

190.    Plaintiff was denied employment opportunities to teach internationally on the basis of his race, color or national origin.

191.    Defendant preferentially awarded international teaching opportunities to members of certain races and discriminated against other races including Plaintiff's race.

192.    Defendant demonstrated disparate treatment discrimination by preferentially using race as a factor in awarding these international teaching contracts, by awarding these teaching contracts to unqualified personnel based on race, and by eliminating the all white Caucasian law faculty from the ability to participate in international teaching contracts.

29

193.   Specifically, Plaintiff was denied or eliminated from the opportunity to apply thirty-seven (37) times and denied the ability to participate in international teaching based on his race, color or national origin.

194.   The positions were filled by people who are not as qualified or unqualified for the position.

195.   IUP demonstrated racial discrimination in their choosing what courses were selected to be instructed by IUP and what were to be instructed by the host university because they desired to not award any teaching contracts to the law faculty because they are Caucasian and wished to maximize opportunities for the preferred races of Indian and Mid-Eastern.

196.   The positions were filled by members of a preferred race at IUP and Eberly and not members that share the race of the Plaintiff.

197.   That the contracts with the host international universities left law courses out of those courses to be instructed by IUP personnel and such were entered into for the purposes of racial, national origin and color discrimination

198.   The positions were filled because of the race of the people and not the qualifications of the people.

199.   Defendant demonstrated disparate treatment discrimination by creating an ingroup they refer to as the "India Mafia" to award teaching contracts to members of their own favored race.

200.   Defendant demonstrated disparate impact discrimination by eliminating law from any ability to teach in international programs regardless of the reasoning behind the elimination.

201.    Defendant demonstrated disparate impact discrimination by a vast over representation of faculty in ECOBIT from India and the Mid-East that cannot exist without intentional discriminatory hiring practices.

202.    Defendant demonstrated disparate treatment discrimination because the reasons they proffered for the racial discrimination are pretextual and the real reason is a desire for Defendant to award contracts to members of favored races over that of Caucasians.

WHEREFORE, the Plaintiff respectfully requests this Court enter judgment in his favor and against the Defendant, and award him damages for past lost wages and benefits, future lost wages and benefits, compensatory damages for humiliation, embarrassment and inconvenience, loss of standing and reputation in the academic community, punitive damages, declaratory and injunctive relief, attorney's fees and costs, adverse tax consequences, and such other relief as the Court may deem appropriate.

A jury trial is demanded.

### Count 2: Title VII of the Civil Rights Act - Retaliation

203.    Plaintiff incorporates all the previous paragraphs by reference as if fully set forth herein.

204.    A substantial and/or motivating factor in much of the conduct of Defendant's employees against Plaintiff was Plaintiff's complaints and Charges concerning racial, color and national origin bias.

31

205.    All of the allegations as set forth in the complaint under Factual background are included in this section as if fully set forth herein. Specifically, but without limitation, all the facts alleging retaliation.

206.    Plaintiff is claiming retaliation by IUP and also in their personal and employee roles by Timothy S. Moerland, Robert Camp, and Ibrahim Affaneh.

207.    Defendant's actions to suspend Plaintiff's teaching duties, forcing him off campus, and instituting an interim evaluation after Plaintiff filed his first Complaint with this Court clearly constitutes a series of retaliatory actions on the part of the Defendant, which created a hostile working environment.

208.    Defendant's conduct in retaliation for Plaintiff's complaints constitutes unlawful retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C.A. Section 2000e-

WHEREFORE, the Plaintiff respectfully requests this Court enter judgment in his favor and against the Defendant, and award him damages for past lost wages and benefits, future lost wages and benefits, compensatory damages for humiliation, embarrassment and inconvenience, loss of standing and reputation in the academic community, punitive damages, declaratory and injunctive relief, attorney's fees and costs, adverse tax consequences, and such other relief as the Court may deem appropriate.

A jury trial is demanded.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court:

A)      Grant a permanent injunction enjoining Defendants, its directors, officers, employees, agents, successors, heirs and assigns, and all persons in active concert and participation with them, from engaging in, ratifying, or refusing to correct, employment practices which interfere with the exercise of rights and/or discriminate in violation of Title VII of the Civil Rights Act;

B)      Order Defendant to institute and implement training programs, policies, and practices and programs designed to ensure the Defendant provides proper leave and does not retaliate and/or interfere with those who engage in statutorily protected activity;

C)      Order Defendant to make whole Brion Scudder, by providing appropriate back pay with prejudgment interest, in amounts to be determined at trial, compensate him for lost benefits, and all other affirmative legal and equitable relief necessary to eradicate the effects of its unlawful employment practice;

D)      Order Defendant to pay Plaintiff compensatory damages in an amount to be determined at trial;

E)      Order Defendant to pay Plaintiff the reasonable attorney's fees and costs and other legal expenses incurred by the Plaintiff in this matter;

F)      Order Defendant to remove and expunge, or to cause to be removed or expunged, all negative, discriminatory, and/or defamatory memorandum or other documentation from the Plaintiff's record of employment; and

G)      Award the Plaintiff such other legal and equitable relief as the Court deems appropriate and just.

33

**A JURY TRIAL IS DEMANDED AS TO ALL ISSUES TRIABLE TO A JURY.**

Respectfully submitted

/s/ Sean A. Casey
Sean A. Casey
PA ID #79806
Email: sean@caseylegal.com

**SEAN A. CASEY, ATTORNEY AT LAW**
First & Market Building
100 First Avenue, Suite 1010
Pittsburgh, PA 15222
T: (412) 201-9090
F: (412) 281-8481